IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

---

In the Matter of The Complaint of X-TREME PARASAIL, INC., a Hawaii corporation, regarding Motor Vessel, X-TREME, Official Number 1153017 for exoneration from or limitation of liability,

Petitioner.

CIVIL NO. CV04-00730 BMK (In Admiralty)

---

VIDEOTAPED RULE 30(b)(6) DEPOSITION OF

GREGORY STUART LONGNECKER

Taken on behalf of the Claimants, Healy Bartlett and Steve Jaques, at the office of Cronin, Fried, Sekiya, Kekina & Fairbanks, 600 Davies Pacific Center, 841 Bishop Street, Honolulu, Hawai'i, commencing at 1:58 p.m. on September 14th, 2005, pursuant to Notice.

BEFORE: B. KANOELANI COCKETT

Certified Shorthand Reporter

HI CSR NO. 379, CA CSR NO. 7995

EXHIBIT B

A. Is that on this different sheet of paper?
Q. It's on the one that's market "Exhibit 1". Here you go.
A. Oh, here it is. I got it.
MR. MONROE: You got it right there.
MR. McPHERSON: Okay.
Q. And it's phrased, "All known information regarding failure of parasail tow ropes in Petitioner's parasailing operations prior to the subject accident."
Now, I gather you may have seen in Jason Bernt's testimony that he identified two prior failures when he testified in the case.
Did you see that?
A. I don't recall seeing that. I didn't get to read his -- all of his deposition. I only read part of it.
Q. Okay.
A. I don't think I recall seeing that because I didn't get that far into his depo, to be honest. I didn't read the whole depo.
Q. Sure.
A. So...
Q. Okay. Well, I have it here. So we can refer to it if we need to, but I think I can accurately represent to you essentially what he said, which is that there were two incidences where the tow line failed, or parted, with



passengers aloft; in other words, parasailing up in the air, parasailing at the time.
A. I understand.
Q. During roughly the summer that he worked for the company last year prior to the accident involved in this case.
A. I understand.
Q. Okay. So was the company aware of those two incidents that Mr. Bernt identified?
A. I believe there were two or three line partings, and if those are the same that he's referenced, then, yeah, of course the company knew.
Q. Okay. And that, I gather, would have been reported by one or the other of the crew?
A. It would be written down probably on the ship's log, on the maintenance log.
Q. Okay. In any event, you and the -- as a company's manager, operations manager, you were aware of it?
A. Yes.
Q. Did you learn what caused those lines to part, or did the company learn what caused those lines to part?
A. No, we never did.
Q. Okay. And I believe Mr. Bernt testified that the line that parted in those instances was the same product; in other words, the same type of line made by the same manufacturer as the one that was involved in the accident in



this case.
Is that your understanding, also?
A. I do believe they were both Sampson Technologies ropes, yes.
Q. Okay. And I think he --
A. I don't know if it was the same line per se, the same spool of line, but I believe it was manufactured by the same company, that's correct.
Q. Okay. The Sampson Rope Technologies Company manufactures a pretty wide range of rope products, right?
A. I believe they are the largest in the world.
Q. Yeah. So what I meant was this specific type of line I think he -- I think Mr. Bernt called it blue steel?
A. That's correct.
Q. That's a particular type of Sampson line, right?
A. That's correct.
Q. Okay. So if I understand you correctly, what you're saying is it was that same type of line, but not necessarily the exact same length of line that was involved in these --
A. That's exactly what I'm saying.
Q. -- incidences? Okay. All right.
You think there may have been as many as three incidents prior to the --
A. I believe it was two, three maybe counting the incident why we're here today.



Q. Okay. And you think that the prior incidents might have been notated in some company record?
A. I'm sure, and they should have been. Normally that stuff is written down.
Q. Okay. So the company would retain those records, at least for this time period, right, a little bit more than a year after, wouldn't they?
A. That's correct.
Q. So they should still be in the company's files, those records?
A. That's correct.
Q. You didn't make an effort to locate them for today?
A. The records?
Q. Yeah.
MR. MONROE: We'll make an effort.
MR. McPHERSON: Okay.
THE WITNESS: We can search for them, all right.
MR. MONROE: If we can find the record responsive to it, we'll send it on to you.
MR. McPHERSON: Great.
MR. MONROE: You won't need to do a request for production.
MR. McPHERSON: Great.
Q. In those two prior incidents that the company was aware of, Captain Longnecker, can you tell me where the line

failed in relation to the connection to the parasail chute and the point where it enters the deck winch on the deck of the boat? In other words, did it part in the middle of the bite closer to the chute, or do we know?
A. I don't know.
Q. Was that ever investigated; do you know?
A. I don't believe it was. I wasn't -- these different incidents you're talking about, I wasn't the master of the vessel, so I really don't know the specifics of where the line parted or any of those things. I just don't know.
Q. Okay. We can agree, can't we, that the failure of a towing line with passengers aloft is a potential safety problem?
A. I guess. I mean, we haven't had anybody hurt on the other incidents so, I mean, I don't know if I can agree to that, but you could say that's not a normal practice, that's correct.
Q. Was anything done to investigate the cause of those two line incidences failure?
MR. MONROE: Asked and answered.
BY MR. McPHERSON:
Q. By the company?
MR. MONROE: Asked and answered.
BY MR. McPHERSON:
Q. You can respond, if you would.



A. I believe no one was hurt. There was no further investigation needed on any of the other incidences.
Q. So none was done?
A. Right.
Q. Let's turn, then, to the second topic for today's proceeding, which is the extent of use and wear, if any, of the tow line involved in the subject accident from the time of its first acquisition up until the subject accident occurred. Let's come at that by getting a few preliminary things.
Do we know when the particular line that was involved in this accident was purchased by the company?
A. I believe it was purchased a week or two prior to the boat being delivered in Hawai'i.
Q. Okay. And do you recall when that was, when the boat was delivered?
A. I believe the vessel arrived July 22nd, and I believe I had purchased a couple of spools of line. I buy a lot of line from Ocean Products, which is the company that we get the line from. We have, you know -- of course I keep line on hand if we need it, when we need to change it, and I think we had two spools prior to the vessel arriving in Honolulu.
Q. Okay. Let me show you a couple of invoices that you may recognize from the production of documents that the company gave to us.
A. Okay.



Q. And first of all, they are both invoices from the Ocean Products Research, Inc. company, right?
A. That's correct.
Q. Okay. And that's the supplier you were referring to a moment ago?
A. Yes, sir.
Q. Okay.
MR. MONROE: Can we have a second copy?
MR. McPHERSON: I'm sorry, yeah, I do. Here you go.
MR. MONROE: Thank you.
BY MR. McPHERSON:
Q. Okay. One is dated, shipping dated May 19, '04, and the second one has a shipping date of June 16, '04.
Do you see that?
A. That's correct, I see that.
Q. Okay. It appears to me that these two invoices describe the same product, though.
They describe it as quarter-inch 1200 foot Amsteel Blue rope, correct?
A. That's correct.
Q. Okay. So looks like the June invoice was for two each, and the May invoice for one
A. That's correct.
Q. All right. Are either of these invoices, can you say, reflective of the purchase of the rope that was involved



in the subject accident?
A. I would, yeah. It would be the second, the one that had two spools, the June, the June shipping date.
Q. Okay. And refresh me, if you would. I think earlier you -- I think earlier you testified that you weren't sure if the line incidents prior to this subject accident in which the line parted involved the same line --
A. Um-hum.
Q. -- or a different line.
You're not certain as you sit here; is that correct?
A. Not certain.
Q. I'm sorry?
A. I'm not certain, no.
Q. Okay.
A. We have two boats, sir.
Q. Okay.
A. They run the same line. So the other partings most likely might not have been on the same vessel.
You do understand that, don't you, we have two vessels?
Q. I didn't understand that.
A. Okay. We need to clarify that.
Q. Okay.
A. We have two vessels that run the same line.
Q. Okay. Do they use the line in different ways?

A. Nope, identical.
Q. Okay.
A. They are winched on. They are hydraulically winched in and out. This June receipt you're looking at, 5-17 --
Q. Yeah.
A. -- most likely was on the motor vessel NACHO, NACHO I, which is a different vessel.
Q. You said "17."
You mean the May?
A. The May, yeah. The 5-19 shipping date, that was most likely on NACHO, obviously, because X-TREME wasn't here yet. X-TREME didn't come until July.
Q. Okay.
A. So this was definitely not on X-TREME.
Does that make sense?
Q. It does, and it would presume, then, that the line that's described in the May invoice was never rigged on the X-TREME at any point.
A. That's correct. That's without a doubt correct. We would never go take one line off another boat and put it on another boat. We don't do that.
Q. Why not?
A. Because we install brand-new line. When this boat was received in Honolulu --
Q. The X-TREME you mean?



A. The X-TREME.
Q. Yeah.
A. I personally put a brand-new spool of Amsteel Blue on that winch.
Q. Okay. Was --
A. And that boat didn't arrive until July 22nd. So the line was most likely put on the 23rd or the 24th.
Do you understand? It was shipped through Matson. Sat over at Matson Navigation. I went and picked it up, put the arc -- I had to mount the radar arch. There's lots of things you have to do before the boat goes in the water.
Q. Um-hum, and, okay, and one of which being installing the sailing line, the tow line?
A. That's correct.
Q. Okay. And was the tow line that was installed new aboard the X-TREME when it came ever changed out before the subject accident?
A. I don't believe it was.
Q. Would that be recorded in any record?
A. It would if it was changed out.
Q. Maintenance records?
A. It should be in the ship's log if it was changed, that's correct.
Q. Okay. Have you reviewed those logs?
A. I think, yeah. I produced 'em and gave 'em to Roy,



and I haven't seen 'em really since then, so...
MR. McPHERSON: Did you produce them to us?
MR. MONROE: You didn't ask for 'em.
MR. McPHERSON: Okay.
MR. YEMPUKU: They weren't included in the production.
MR. McPHERSON: All right.
Q. So basically the uncertainty as to whether the same line involved in our accident, meaning the one in this case, and the two prior incidents that the company was aware of, the uncertainty of whether it was the same line involved in more than one incident stems from the fact that we don't know which vessel was involved in the prior incidents, as you sit here; is that correct?
A. Correct.
Q. All right. Did Jason Bernt sail aboard the NACHO?
A. I believe he did, yes, sir. At the time of this we had --
MR. MONROE: There's no question pending.
THE WITNESS: All right.
BY MR. McPHERSON:
Q. At the time of this accident you were running both boats?
A. That's correct.
Q. Is that what you were going to say?



A. Yeah.
Q. And Jason was working on both?
A. Um-hum, that's correct.
Q. (Indicating.) And, again, the vessel logs from both vessels should clear that up because the failure of the line should be noted somewhere in the log, correct?
A. That's correct.
Q. All right. Okay, then. So it appears that we are clear that the line involved in the subject accident was shipped in mid June '04 and installed on the boat just after its arrival, which would have been the last week of July.
A. That's correct.
Q. Okay. Do you know how many flights it was used in after it was installed before the accident?
MR. MONROE: Objection, calls for speculation, lack of foundation.
THE WITNESS: We could guess.
BY MR. McPHERSON:
Q. Okay. And the records, the vessels' records would reflect how many flights, wouldn't they?
A. Possibly.
Q. Okay. You didn't review those records in preparing today?
A. No.
Q. When you say "possibly," wouldn't there be a number

Page 42

Q. Okay. And the Amsteel Blue rope, that's what this particular tow line's known in, in the parasailing industry?
A. That's what Sampson Technologies calls it.
Q. Okay. And was that particular product selected for any particular reason?
A. Its strength.
Q. Anything else?
A. That's it.
Q. Okay. I noticed in the answers to interrogatories that we marked as, I believe, Exhibit 2 -- before we go on, let's go ahead and mark the invoices as 3 and 4, respectively. The May one is 3, and the June one is 4.
With respect to the interrogatory 2 in the interrogatories you should have there near to you, let me ask you to look at answer No. 8 on page 8, or beginning on page 8 there at the bottom.
You see that?
MR. MONROE: Response to interrogatory No. 8, is that what you're talking about?
MR. McPHERSON: Yeah, yeah.
(Claimants' Exhibit Nos. 3 & 4 were marked for identification.)
BY MR. McPHERSON:
Q. The second sentence in the response says, "The tow line parted under normal weather and normal operating

Page 43

conditions and within the safe operating parameters as determined by the manufacturer." It's that last phrase I want to ask you about, Mr. Longnecker.
What are the company's -- what is the company's understanding of the safe operating parameters as determined by the manufacturer for this particular tow line?
A. A minimum of 5800 pounds breaking strength.
Q. Okay.
A. Or three-eighths diameter.
Q. What is the typical strain in terms of pounds on the tow line during a parasail operation?
MR. MONROE: Objection.
MR. McPHERSON: Or what's the range of it?
THE WITNESS: I don't know.
MR. MONROE: Objection, calls for an expert opinion.
BY MR. McPHERSON:
Q. Is it 5800 foot pounds? Is that the measure, more precise measure; do you know?
A. I don't know.
Q. Okay. So the 5800 pounds minimum breaking strength, that comes from some manufacture --
A. Standard. That's a standard in the industry. It would be like a PAPO standard.
Q. Okay. And this line meets that standard, as far as you know?

Page 44

A. Exceeds it.
Q. Exceeds it.
Do you know what its breaking strength is?
A. Ninety-six hundred.
Q. But as you sit here, the company is not able to know how many pounds strain is on the line during its operations?
A. That's correct, I have no idea.
Q. Okay. How do we know that it's less than 9600?
MR. MONROE: Objection, argumentative and you're going beyond the subject No. 2, parameters of No. 2 area of inquiry of the 30(b)(6).
BY MR. McPHERSON:
Q. Do we know?
A. No, we do not.
Q. And the Amsteel Blue is a synthetic fiber line; is that correct?
MR. MONROE: Objection, calls for speculation, calls for an expert opinion.
THE WITNESS: I don't know what it's made of, sir.
BY MR. McPHERSON:
Q. You must have a lot of experience with line, though; your time in the Coast Guard and your subsequent career in the civilian industry; is that fair?
MR. MONROE: Counsel, that's beyond the parameters of the 30(b)(6) deposition, and we're not going to go there,

Page 45

all right? Stay within No. 1, 2 and 3 and we're okay. You want to go outside that, that's -- you know, you're exceeding the scope of this deposition. This witness was not prepared for questioning in other areas other than these areas that you've noticed this deposition for.
MR. McPHERSON: I think it's within it.
Are you instructing him not to answer, or can we go on?
MR. MONROE: Well, we're getting close to it.
MR. McPHERSON: Okay.
MR. MONROE: All right.
BY MR. McPHERSON:
Q. What was the answer? Do you remember the question?
MR. MONROE: The question -- ask the court reporter to read back the question. I don't want him to rely on his memory.
Madame Reporter, would you read it back, please.
MR. McPHERSON: I'll restate it.
MR. MONROE: All right.
BY MR. McPHERSON:
Q. I'll try and shorten it for you.
You've had a lot of experience with line in your time?
A. That's fair to say.
Q. That's fair, okay.

You'd agree that line can be compromised if it's chaffed or cut, wouldn't you?
A. I would think that's a safe --
MR. MONROE: Objection, it's vague, ambiguous, and calls for an expert opinion.
MR. McPHERSON: You can answer, though.
MR. MONROE: If you want to give an opinion, you can.
THE WITNESS: Yeah. I mean, I'm not going to give an opinion on that.
BY MR. McPHERSON:
Q. Did the X-Treme company have any procedures with dealing with its parasail tow lines, should they become chaffed or cut?
MR. MONROE: Objection. Counsel, this does not go into the No. 2. No. 2 goes to the extent of use and wear, if any, of the tow line involved in the subject accident from the time of its first acquisition up until the subject accident occurred. Now, that is clearly beyond the parameters of and scope of that particular area of inquiry.
MR. McPHERSON: I don't think so.
MR. MONROE: Well, I think it is.
BY MR. McPHERSON:
Q. Let me ask you a different question, Mr. Longnecker.
Is there any information that's available to the



company that the tow line involved in this case was subjected to any chaffing or cutting on the day of the accident?
A. Not that I'm aware of.
Q. Okay. You're not aware of one of the passenger's statement that it went under the boat and had to be retrieved from underneath?
A. That's the first I've ever heard of that.
Q. Okay. I'm going to ask you to assume that that's true.
A. You're asking me if that's true.
Q. No, I'm asking you to assume that that's true; that the tow line went under the boat prior to the subject accident, okay?
A. I have no idea.
Q. I know.
MR. MONROE: Wait, wait, go ahead.
BY MR. McPHERSON:
Q. Would the company have any procedures in place in order to check for any wear with regard to the tow line in such a circumstance?
MR. MONROE: Objection, it's an incomplete hypothetical, calls for an expert opinion, goes beyond the scope of the 30(b)(6) deposition. Next question. He's not answering it.
Okay?



MR. McPHERSON: Well, we'll reserve all rights to compel an answer to it.
MR. MONROE: That's fine. You can take his deposition as a fact witness, but he's here today on a 30(b)(6). You want to Notice his deposition as a fact witness, then whatever you want to do.
All right?
MR. McPHERSON: All right.
MR. MONROE: Howard, we've been at this for about an hour.
Can we take a break? I need a cigarette.
MR. McPHERSON: Sure. Off the record.
MR. MONROE: Okay.
(Recess was taken from 2:54 to 3:10 p.m.)
MR. McPHERSON: Back on the record.
Q. Mr. Longnecker, after the break is there any of your previous testimony you feel you need to correct or amend?
A. No.
Q. All right. The tow line that was involved in this subject accident, was it inspected for wear at any time on the day of the accident prior to the accident?
A. The captains and crew are instructed to inspect the line daily.
Q. Okay. Do you know if they did?
A. I don't. I tell them. I mean, we verbally tell



them to inspect it. If they did or not, I don't know.
Q. What are they told to look for?
A. These guys that we hire, sir, are already parasail captains, so I don't tell them what to look for. They known what they are looking for.
Q. What are they looking for? I mean, can you describe the wear that would be visible on inspection?
A. Well, the line, you know, we inspect it daily, the end. They don't inspect the entire length of the line. We inspect the ends of it. When it needs to be trimmed, we cut it.
Q. What would indicate it needs to be trimmed?
A. That's up to the skipper.
Q. The company doesn't have any guidelines --
A. No.
Q. -- in that regard? (Attorney nods head.)
When would you trim it, if you were the captain?
MR. MONROE: You're going beyond the scope of paragraph 2, Counsel. I'll let him answer it if he wants to answer it.
THE WITNESS: Yeah. I don't even know how to answer that question.
MR. McPHERSON: All right. We'll take that up another time when you are able to answer it.
Q. Let's move to the third subject for today's

proceeding, which is the subject of what became exactly of the failed portion of the tow line involved in this accident.

In terms of background and context, what portion of the line did fail; do you know?

A. I believe it was close to where it's tied.

Q. To the chute?

A. That's correct.

Q. Okay. Do you know how close, can you estimate?

A. I don't know.

Q. Did you ever see the failed portion?

A. I did not.

Q. How do you come to the understanding that it was close to the tied end?

A. Because we continued to use that same line for, I believe, two or three days after the incident, so I know it couldn't have been too far in the middle or too far from the end.

Q. Because the line would have been shortened, you mean?

A. Correct.

Q. Okay. But isn't it 1200 feet?

A. Yeah, but it's not -- at the day that that happened I don't know how long it was, because we trim it daily, so you know what I mean? It's hard to say how much line was on that.

Q. You mean when the day began in which the accident



occurred, it's hard to say how much was remaining of it at that time?

A. That's correct.

Q. Out of the original 1200?

A. Well, the original 1200, when you put it on the boat you leave about 150 on the drum that never comes off because we mark it so you know where the line is when you're letting it out. We never let out more than probably a thousand feet.

Q. Okay. Is that having to do with the flying operation, that's where you get it to a proper height, or is there some other reason?

A. No. It's just the way we do it.

Q. Okay.

A. Leave that much on the drum, just leave it on there.

Q. And no particular reason, though?

A. (Witness shakes head.)

Q. Okay. So what you're saying is by measuring the length after the failed portion was cut away, you're still not able to determine how much was cut away; that's what you mean?

A. Correct.

Q. Okay. And when was the failed portion cut away?

A. I don't know the answer to that question.

Q. But you say the line was continued in use for -- did you say two or three days after the accident?

A. I believe so, yeah. I wasn't the captain, so I have



no idea if -- you know, I don't know. I just don't know.

Q. Do you know who was the captain from -- well, we know on the day of the accident it was Captain Jamie, right?

A. That's correct.

Q. How do you pronounce his last name?

A. Regelbrugge.

Q. Regelbrugge.

MR. YEMPUKU: That was a good question.

MR. MONROE: Polynesian name.

MR. McPHERSON: Call him -- Captain Jamie we'll call him.

MR. MONROE: Yeah.

BY MR. McPHERSON:

Q. All right.

MR. MONROE: Captain Jim.

BY MR. McPHERSON:

Q. He was the captain on the day of the accident?

A. That's correct.

Q. How about the days following it when the tow line was still in use?

A. I believe it was John Gonda.

Q. All the rest of 'em?

A. I believe so.

Q. Okay. Do you know if it was cut back after it failed?



A. I'm not positive that it was, but I'm assuming it was.

Q. You assume so?

A. I'm assuming, yeah.

Q. Because you wouldn't want to use the frayed failed portion in the rigging after that, right?

A. Correct.

Q. Okay. So in order for its continued use, you assume it was cut back, and you're not sure if it was Captain Jamie or Captain John that --

A. It was most likely Captain John --

Q. Okay.

A. -- that trimmed it.

Q. And is he still working with the company?

A. He subcontracts, like I said. He just left earlier. I stated he left August 31st. He's back in Arizona. He'll be back in December.

MR. MONROE: You can do him the same time we do your client in L.A.

MR. McPHERSON: We can talk about all that stuff after.

Q. So you didn't talk to Captain John Gonda is it?

A. That's correct.

Q. Gonda, about whether he cut back this line or not?

A. I was actually -- I was in Japan, I think, on the

Page 54

23rd. I left several days after that or a few days after that.

Q. I mean in connection with trying to ascertain --

A. No, no.

Q. -- when and by whom it was discarded?

A. (Witness shakes head.)

Q. "No?"

A. No.

Q. Do you know when and by whom it was discarded?

A. No.

Q. Do we know why it was discarded?

A. No.

Q. So fair to say after the accident there was -- no effort was made to preserve it?

A. The line was preserved approximately two to three days after the accident.

Q. But not the failed portion?

A. The failed portion, I'm not sure. I don't know what happened to it.

Q. It might still be around somewhere?

A. It's possible. I mean, I believe the whole length of the line was preserved. Now, whether the end of that, the bitter end of that was the failed portion or not, I don't know.

Q. How would you find out if you're trying to find out?

Page 55

A. I don't. You'd have to have a crystal ball --

Q. Okay.

A. -- to find out if that bitter end is what actually failed. I don't know. I don't know how you can find that out.

Q. You mean to find out why it failed, is that what you're saying?

A. No.

Q. I didn't quite understand you.

A. The line that was on that drum was put into a trash bag.

Q. Okay.

MR. MONROE: Wait, wait a minute. Let's get the question out.

MR. McPHERSON: Let him finish.

MR. MONROE: Let's get a question out before he answers.

Now, what's the question?

BY MR. McPHERSON:

Q. Do you know if the failed portion of the line that was involved in this accident still exists somewhere and still -- someone has it somewhere?

A. I don't know.

Q. Okay. How would you find that out if you were going to find out?

Page 56

A. I don't understand your question.

Q. If you wanted to determine whether that line's been permanently disposed of irretrievably or whether it's sitting somewhere --

A. Um-hum.

Q. -- at this moment, how would you find that out?

A. How would I find out if that line?

Q. The failed portion of the line.

A. Failed portion of the line, that would probably be a question for Jamie and Jason, but I never asked it, so I don't know.

Q. And why do you say those two; because you think presumably that they did something with it?

A. Well, no. They put the boat up after the -- that day.

Q. Any other way that you think you could determine what happened to the failed portion?

A. No.

Q. Okay. Are those two guys available to the company to ask that question?

A. I don't know where they are. Like I said, they were subcontracted. They are doing different things. I don't know.

Q. Okay. I think Jason testified his last day was that day, the day of the accident, last day of working.

Page 57

Is that your understanding, too?

A. I believe he started fishing, that's correct.

Q. Okay. How about Jamie, when did he leave the company?

A. He -- I believe when I got back from Japan he was parasailing with another parasail company.

Q. When did you get back again?

A. I believe it was the 29th to the 30th. I'm not sure, not certain.

Q. I'm sorry, the 20 --

A. The 29th or the 30th of August.

Q. Of '04?

A. Correct.

Q. And he was gone by then, you think?

A. Well, I don't know.

Your definition of "gone," what do you mean by "gone"?

Q. Not working for the company anymore.

A. I guess that would be -- that's one way to put it, yeah. He was a subcontractor. I mean, he was no -- there was no --

Q. Oh, okay.

A. I didn't fire him.

That's what you're asking me?

Q. He never was an employee; is what you're saying?

A. Right.
Q. And then he was no longer working with the company as a contractor by the time you returned from Japan?
A. Correct.
Q. Okay. Wouldn't the X-TREME vessel's log reflect if that tow line was cut back on that day? It should, right?
MR. MONROE: After the accident or before the accident?
MR. McPHERSON: After the accident.
THE WITNESS: If they filled out the log.
BY MR. McPHERSON:
Q. Okay. And you haven't looked at that?
A. No.
Q. So, Mr. Longnecker, in conclusion, then, with respect to the question of what became of the failed portion of the line, at least as you sit here now, the company doesn't know what became of it?
A. That's correct.
Q. Or when, other than, well, you think it was cut back sometime in that three-day period after the accident and before the line was taken out of service?
A. That's a safe -- yeah, that's safe to say, yeah.
MR. McPHERSON: All right, then. Subject to getting the logs and any right we may have to reopen the deposition to ask questions on the information contained in those logs that



weren't reviewed, I have no further questions at this time.
Thank you very much.
THE WITNESS: Um-hum.
MR. MONROE: We'll take an original, a copy, ASCII disk and a compressed, and Mr. Yempuku will take a copy. We will not waive reading and signing.
(Whereupon the deposition was concluded at 3:24 p.m.)



W I T N E S S C E R T I F I C A T E

I, GREGORY STUART LONGNECKER, hereby certify that I have read the foregoing typewritten pages 1 through 60, inclusive, and corrections, if any, were noted by me, and the same is a true and correct transcript of my testimony.

Dated this ______ day of ____________________, ______

______________________________________________
GREGORY STUART LONGNECKER

Signed before me this ______ day of ____________________, ______

______________________________________________

X-TREME PARASAIL, INC., Civil No. CV04-00730 BMK
Taken September 14th, 2005, by B. Kanoelani Cockett, HI CSR No. 379, CA CSR No. 7995



C E R T I F I C A T E

STATE OF HAWAII )
)ss.
CITY AND COUNTY OF HONOLULU )

I, B. KANOELANI COCKETT, CSR, Notary Public, State of Hawai'i, do hereby certify;

That on September 14th, 2005, at 1:58 p.m. appeared before me GREGORY STUART LONGNECKER, the witness whose deposition is contained herein; that prior to being examined he was by me duly sworn;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewritten form under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

Dated this 26th day of September 2005 in Honolulu, Hawai'i.

______________________________
B. KANOELANI COCKETT,
HI CSR NO. 379, CA CSR No. 7995
Notary Public, State of Hawai'i
My commission expires: February 19th, 2009